U.S. DISTRICT COURT - N.D. OF N.Y.

FILED

FEB 0 5 2021

AT_____ O'CLOCK_____
John M. Domurad, Clerk - Albany

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Joseph S. Barone, | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. *1:21-CV-131 (GTS/TWD)* |
| v. | ) | |
| | ) | |
| The Lawyers Fund, | ) | **COMPLAINT** |
| Supreme Court of New York | ) | |
| Appellate Division | ) | |
| Third Department | ) | |
| | ) | |
| Defendants. | ) | |
| | / | |

### Statement of the Case

Plaintiff is apparently the victim of a discrimination program engaged in by the

Defendants directed towards *pro se* litigants.   This lawsuit is an attempt to correct (at

least part of) that problem.

### Jurisdiction

The jurisdiction of this Court is invoked pursuant to:

42 U.S.C. §1983,  42 U.S.C. 12101 et seq.

28 U.S.C. §§ 2201, 2202 and 1651(a), the All Writs Act,

28 U.S.C. §§1331and

28 U.S.C. §§1343.

1

## Parties

Plaintiff is Joseph S. Barone, 155 Augusta Plantation Dr, Apt U, Myrtle Beach, South Carolina 29579

The Lawyers Fund for Clients' Protection is a government trust fund intended to protect legal consumers from dishonest lawyers.   Its address is 119 Washington Ave., Albany N.Y. 12210.

The Supreme Court of New York, Appellate Division, Third Department has a business address of Robert Abrams Building for Law and Justice, State Street, Room 511, Albany N.Y. 12223.

## Statement of Facts

1.    For nearly two decades, Joseph S. Barone (heretofore to be known as Barone) was an invaluable and abundantly fruitful confidential asset to the Federal Bureau of Investigation (FBI). With approximately 75 dedicated instances of quarterly status reports touting Barone's exemplary and unprecedented productiveness, and three times as many spontaneous activity reports, stating that Barone was *trustworthy, markedly honest, reliable, honorable, dependable, and dedicated to the purpose and function of the FBI narrative*, in the FBI's own words.

2.    During his tenure with his sole handler, Vincent Presutti, agent Presutti noted that the intelligence Barone provided was so "*accurate and complete*", Barone never

2

once had to provide testimony, wear a wire or reveal his identity. Repeatedly, Agent Presutti reported that it was imperative to maintain the anonymity of his most valued source, Barone, outside the FBI, but also within the ranks of the bureau, not only for the benefit of the FBI, but for Barone's ultimate safety.

3.    In all of the nearly twenty years that Barone was dedicated to, and risked his life for his trusted handler, Presutti, and moreover, the FBI, he never once was accused of, investigated for, or involved in any criminal activity. He never once requested or received payment for the valuable information he provided. His authorization from the FBI fully encompassed virtually every aspect of criminal language and associations crucial to his ability to be of continued value to agent Presutti and the success of the FBI.

4.    A prime example of Barone's dedication to the cause inherent to the FBI is when Barone provided forensically accurate information which prevented the murders of a sitting Federal Judge, Judge Nicolas Garaufis, and an acting AUSA, Greg Andreas, as well as preventing the murders of several others in the private sector. In addition to these tremendous benefits which Barone willingly and readily provided, he never once pursued monetary gain from, nor was he offered such gratitude from agent Presutti or the FBI.

5.    Agent Presutti retired at the end of October of 2008 and Barone was transferred to another agent/handler, Mike Trombetta. Within days, Barone was put to work investigating and gathering intelligence for agent Trombetta and the FBI from the

3

Lucchese crime family. But on 9 January 2009, just six weeks after agent Presutti retired, something went wrong, Barone, who was working under the authorization of the FBI, just as he had for the past two decades, was arrested by a separate unit of the FBI, C-5. When Barone called on agent Trombetta to clarify for agents of C-5, that he, Barone, was undercover, Trombetta did not come to his defense, but rather, pushed Barone to "cooperate" with, and "work" for the agents of C-5. Barone was concerned, but still trusted that his handler, Trombetta, was doing what was best.

6.      Soon thereafter, Barone began to realize that no one within the FBI was looking out for his safety, nor were they concerned with maintaining his anonymity within the bureau, or among the criminal society in which Barone had risked his life for nearly two decades. This betrayal was inconceivable to Barone, he was devastated, confused and despondent.

7.      C-5, after forcing Barone to commit to activities that not only disclosed his identity to murderous criminals, namely a known mafia associate, and convicted murderer, Pat Lombardo, placing Barone's life in imminent danger, and rendering him completely useless to any future investigations. The agents of C-5 then proceeded to put Barone in prison under false charges, for activities in which the FBI had authorized Barone's participation. This was all proven at trial.

4

8.   Barone was confused, frightened, helpless and feeling betrayed by the very same people to whom he had dedicated and entrusted his life. This is when Roy Kulcsar saw an opportunity and took it. In the Court's decision to deny Barone restitution from Kulcsar's thievery, they state that Barone failed to prove that the money was stolen. Barone has presented, on multiple occasions, statements directly from Roy Kulcsar which support Barone's claim. One being the hastily hand written "contract" between Barone and Kulcsar. This document makes clear that for Kulcsar there was an urgency to separate Barone from his money. Any legitimately honest lawyer with good intent would have taken the time to draw up a typed and valid contract and have it witnessed by someone else at the signing. This never happened. Another being of that same document's content, it states clearly that the money was to be held in Escrow, this also never happened. The money remained in Kulcsar's personal business account. His intent was clearly stated again a third time in his lawyer's statement to the Disciplinary Committee, in which Kulcsar again states that the money was meant to be placed in Escrow, but this never happened.

9.   It was clear in Shannon Ross's sworn testimony, that she had researched the legality of placing money in an Escrow or IOLTA account, which would both be easily traceable and monitored by the FBI had they ever been interested in Mr. Barone's liquid assets. They NEVER were. It was a lie made up by Kulcsar intent on separating Mr.

Barone from his money. There can be no conspiring between Barone and Kulcsar where the safe keeping of Barone's money was concerned. Barone had no legal control over his assets at the time Kulcsar drafted that first "contractual" agreement. The court is incorrect in their finding that there was not ample evidence to support Barone's claim that Kulcsar operated with intent to extort as much of Barone's money as possible.

10.  There was NO factual basis for the Lawyer's Fund to deny Mr Barone's initial claim, nor any additional supporting evidence as presented at the behest of the Lawyer's Fund over the course of 6 years. Their determination was based purely on speculation and conjecture, while cheaply attempting to retry and convict Barone of the charges for which he had been acquitted. Mr. Barone provided ample, complete and thorough documentation of the events which took place prior to Kulcsar scamming him, as well as during and after the scam took place.

11.  While in general population at the Metropolitan Detention Center (MDC), having been robbed of $40k, and abandoned by his first paid attorney, George Santangelo, Barone's cellmate introduced Barone to his attorney, Roy Kulcsar (Kulcsar/Roy). Unbeknownst to Barone, Roy was currently under investigation by the Disciplinary Committee (DC), in lower Manhattan, for misconduct and commingling client funds.

12.  Barone's then fiancé, Shannon Ross, did some investigating into Roy, after learning that Barone had just paid Roy a flat fee of $15k to represent him. No information from the Disciplinary Committee's (DC) ongoing investigation into Kulcsar's shady practices was available at that time, nor any other previous criminal activity or misconduct records were found within public records at that time.

13.  As Barone's attorney, Roy, with nefarious intentionality and purpose of goal, gained Barone's confidence and trust. Roy capitalized on Barone's fear and feelings of betrayal and abandonment, to access a treasure trove of information from a vulnerable and often loquacious Barone, including but not limited to, the totality of and availability to Barone's liquid assets. It was later discovered during the DC investigation and ultimately the disbarment hearings of Mr. Kulcsar, that he had extorted other clients as well, Barone was just the most prolific.

14.  By order of "outside law enforcement", Barone was subsequently transferred to the Special Housing Unit (SHU), more commonly known as solitary confinement, where for the next fifteen months he no longer had access to the outside world, with the exception of legal meetings with Roy, one hour a week visitation with Shannon Ross, and a single 15 minute phone call per month on a phone line that was less than reliable. This was done under the guise of "protection" due to an FBI "leak" to the media of Barone's

involvement with the bureau. According to the FBI, Barone's life was now in imminent danger.

15. This created the perfect environment for Roy's greed and subterfuge. To add grease to the wheels, Roy used the example of a Columbian inmate, also housed on the SHU, from whom the government had seized all assets, rendering him unable to pay for a lawyer of his choosing.

16. Roy began to visit Barone several times a week, bombarding him with fictitious and increasingly horrifying scenarios in which Barone's betrayers would further his already overwhelming suffering and misery by denying him the right to legal counsel by means of freezing all of his assets.

17. Again, Barone turned to Shannon Ross for help. After many discussions with Roy's paralegal, Nancy, regarding the legality and legitimacy of placing half of Barone's liquid assets into an escrow or IOLTA structured account. Shannon did further research on BAR Association based websites, and determined that there was NOTHING illegal about what Roy was proposing. Roy took his plan even further by showing false escrow account numbers and statements to Shannon Ross. He secured Barone's trust by penning a "contract" while in visitation at MDC, stating that Barone's money would be placed in escrow, and that if, at any time, Barone wished to withdraw the money and put it back

8

into his personal accounts, Roy would comply. The handwritten note from Kulcsar has been provided.

18.  After Barone refused to make Roy his Power of Attorney, (POA) Roy convinced Barone to make Shannon Ross his POA with total control over Barone's liquid assets. Kulcsar and Shannon then proceeded to meet at the various banks to make the withdrawals. Copies of the checks have been provided.

19.  By use of terroristic threats, false reassurances and extortion, Roy Kulcsar took possession of approximately 50% of Barone's legitimate liquid assets, including multiple loans to Roy and partial repayment by check, of the $40k retainer paid to George Santangelo, ($2,500) which was returned to, endorsed by and cashed by Roy Kulcsar.

   a.  2 April 2009 Payment in full for legal representation $15,000 bank statement provided.

   b.  27 April 2009 Promissory note and loan of $21,000 a copy of note and check have been provided.

   c.  An additional $1000 was loaned to Roy in cash, on top of the cashier's check for $21,000 A copy of the hand written receipt for $1000 had been provided.

d. Date unknown, George Santangelo issues a partial repayment of Barone's legal fees $2,500- Roy cashes the check and keeps the money We never received proof but Kulcsar informed Barone on the SHU.

e. 6 June 2009 Roy states that more fees are required for the case and receives an additional $9,000 in cash Bank Statement provided.

f. 6 June 2009 Roy takes possession of $20,000 cashier's check earmarked for the escrow account Copy of check provided

g. 6 June 2009 Roy takes possession of $59,000 cashier's check earmarked for the escrow account Copy of check provided

h. 3 July 2009 Roy takes possession of $80,000 cashier's check earmarked for the escrow account Copy of check provided

i. While at the bank, Roy requests and issues a receipt for an additional $2,000 in cash, as a loan but the bank closed before he could get it. Copy of hand written receipt on the back of Roy's business card provided.

     i. In total, Roy received $24,000 in legal fees

     ii. In total, Roy received $24,500 in personal loans from his incarcerated client

     iii. In total, Roy received $182,500 to be placed in escrow, this never happened.

10

j.  2010 April/May Shannon Ross sought and retained a legitimate lawyer. Roy was fired and replaced. He still had not returned the total of Barone's savings as agreed to in the hand written contract.

k.  2010 July, Barone is acquitted and released from prison, and immediately files a complaint against Roy with the DC.

i.  Once confronted by the DC, and Shannon Ross-Barone, over time, Roy repaid some of the money, but a remaining balance of $88,300, not including the "legal fees" is still outstanding.

ii.  In a statement made early in the proceedings to the DC, Roy says that he hasn't done anything wrong because he took whatever monies from "criminals". NOTE: All of Roy's theft took place with PRE-TRIAL clients, including his extortion from Barone.

l.  2012, June Roy does not appear for or answer to the accusations presented at his DC hearings and is found guilty by default.

m.  2012 June, Roy is disbarred, in part due to his immoral and unethical actions against Barone. Barone also files a criminal complaint with Albany regarding Roy, nothing manifests, in spite of all of the evidence against Roy.

n.  2012 June, Following Roy's disbarment, Barone files a claim with the Lawyer's Fund for Client Protection (Fund).

o.    2017 September/October Nearly six years after submitting to and complying with years of requests by the Fund to present MORE evidence in addition to the 2" thick bound book provided, AND the determination by the DC for disbarment and perpetual quarterly delays by the Fund, the Fund issues a partial denial for recovery of Roy's legal fees. Nowhere in any evidence provided did claimant Barone state that he conspired with Kulcsar to "hide" money. In fact all of the evidence shows that the exact opposite took place. Kulcsar used terroristic threats to intimidate Barone, frighten him and coerce him into giving Kulcsar the money, which was to be placed into a legal and traceable Escrow account. The FBI NEVER wanted or intended to touch Barone's money, but Barone was so frightened and intimidated by Kulcsar that he complied with his legal counsel, NOT A CRIME, and agreed to place half of his liquid assets in Escrow in order to be able to afford his own defense against the FBI, who had betrayed him. It's unconscionable that anyone with 5 minutes practicing law can twist this to be anything but what it is, in fact, that anyone with a degree in law is not appalled by the actions of this disgraced attorney who was found to have used the same methods of terroristic threats and extortion again other clients, could issue such statements as were written into the previous and current denials.

20.  To the argument that Barone never contested the first denial of recovering legal fees,

i.   *Barone did not contest the denial of fees because in spite of the apparent*
*malicious intent thereof and ineffectiveness of Roy's counsel, Barone was confident that*
*given the insurmountable and indisputable evidence, Roy's disbarment on the federal and*
*subsequent State levels, and meeting EVERY criteria set forth by the Fund for recovery,*
*he would receive repayment of the extorted funds. Additionally, the lawyers of the DC*
*had assured Barone that his claim was so formidable that it would potentially take only*
*months to recover his losses.*

p.   2018 January The Fund denied Barone's claim, based on their desire to
retry Barone for crimes of which he was acquitted. The determination they made based
on speculation that somehow Barone colluded with Roy to "hide" legally obtained money
from the government by placing it in a legal and traceable IOLTA or escrow account is
completely false and sworn witness testimony disproves the viability of this theory. This
most recent denial simply parrots the failed arguments by the fund from previous denials.
There has been absolutely NO consideration for facts, evidence and sworn testimony
which ALL contradict these fabricated claims.

q.   In spite of ample evidence including a written contractual agreement,
hand written on the Special Housing Unit (SHU) by Mr. Roy Kulcsar, copies of all the
checks deposited into Mr. Roy Kulcsar's personal business account, which states that the
money obtained was intended to be placed into escrow, a letter from Mr. Kulcsar's

attorney during his disbarment hearings, reports from Jeremy Garber of the Disciplinary Committee of the Southern District of New York, the uncontested disbarment of Mr. Roy Kulcsar, sworn testimony in the form of an affidavit by Shannon Ross, The Lawyer's Fund For Client Protection has rewritten the outcome of the criminal trial and factored in Barone's civil case in order to find Mr. Barone guilty of charges for which he was acquitted.

21.  From Spring 2009- Spring 2010 Mr. Roy Kulcsar was Barone's legal representative and his main contact with the outside world. With the exception of his then fiancé, Shannon Ross, he was almost solely reliant on and had to place his trust in Mr. Roy Kulcsar.

22.  Additionally, the courts in their denial of Barone's appeal, not based in the facts present, have made themselves complicit in further carrying out this miscarriage of justice.

23.  The evidence proves that Mr. Roy Kulcsar has been barred for life from practicing law on both the State and the Federal levels in the state of New York, in part due to his co-mingling of client funds, his ineffectual counsel, and unethical, immoral and criminal acts against numerous clients, including Barone.

24.  The evidence ignored by both the Lawyer's Fund and the courts shows clearly that in the spring of 2009 Mr. Roy Kulcsar visited Barone at the Metropolitan Detention

Center (MDC) on the Special Housing Unit (SHU) (Solitary Confinement) in Brooklyn, New York.

25.   The evidence shows that Mr. Roy Kulcsar preyed on Barone's helpless situation, using lies and intimidation, instilling greater fear in Barone needlessly in order to extort as much money from Barone as he possibly could.

26.   Mr. Roy Kulcsar knew that at that time Barone only had direct contact with his then fiancé, Shannon Ross, and Kulcsar. Barone was limited to a single-15-minute phone call per month and one-one-hour visit from Shannon per week, with no other contact with the outside world.

27.   Shannon Ross has provided all of the cashed checks with Mr. Roy Kulcsar's personal account number on them as evidence that he never intended to place Barone's money into an escrow account, but that he fraudulently presented this account information as such.

28.   The money Mr. Roy Kulcsar claimed the government would seize to further torture Barone, was all documented and legally gotten gains. The FBI knew this, and never monitored Barone's accounts at any time during his pre-trial detention. Mr. Roy Kulcsar, acting as Barone's attorney, was well aware of this and thusly took advantage of Barone's diminished physical and mental capacity to rationalize, and make logical decisions.

29.  The evidence shows that Barone ultimately made Shannon Ross his Power of Attorney,  (POA), whereby she has sworn to the fact that she researched the legality of placing money into escrow in order to pay for any potential additional legal fees in the future. In her testimony, Shannon states clearly that she alone had to consent, based on the legal advice she had sought from outside legal counsel and sources.

30.  Having no legal experience or legal contacts of her own, and a very limited income, Shannon swears under oath to the fact that she contacted Mr. Roy Kulcsar's paralegal, "Nancy", to inquire as to the legal and ethical nature of Mr. Roy Kulcsar receiving Barone's money and placing it into an escrow account.

31.  Shannon goes onto state that Nancy informed her of multiple legal options such as IOLTA and some forms of escrow accounts.

32.  Additionally, and to reaffirm what Nancy had told her, Shannon swears under oath to the fact that she sought further counsel from online "legal" advisory websites where she learned that there was *nothing illegal* about a person without direct access to their funds (imprisoned or otherwise) to place money in escrow or IOLTA accounts. And that this was a legal means of protecting the client from unscrupulous lawyers and third parties.

33.  Shannon swears under the oath of her POA, she and Mr. Roy Kulcsar agreed to specific terms, which he never intended to meet. The agreement was that only AFTER

Mr. Roy Kulcsar agreed that the money was Mr. Barone's, would remain Mr. Barone's, and would be returned to Mr. Barone at any time without prior notice or explanation, would she agree to *consider* the transfers. Lastly, only AFTER Mr. Roy Kulcsar agreed that Shannon would receive proof of the creation, maintenance and statements from the new account, did she finally *agree* to the transfers.

34. Shannon was solely in control of Barone's finances at the time, and in spite of the evidence, the Lawyer's Fund for Client Protection denied Barone, stating that he conspired to hide money from the government. This is repeatedly documented to be patently false.

35. The Lawyer's Fund for Client Protection and the courts have blatantly ignored the hard evidence in this claim, altered facts, and brought in evidence that was repeatedly disproved at trial, where Barone was acquitted, in order to fabricate justification for denying his claim.

36. Also documented in the evidence, at the time that Shannon Ross was managing Barone's funds, he suffered a severe STAPH infection that had caused the first of three, large, extremely painful, walnut sized-calcified masses to form in his groin, thigh and buttocks area. Barone additionally suffered weight loss and irregular heartbeats. The evidence shows that Barone was provided medical hearings with his trial judge, and ordered to outside hospital care on multiple occasions. Mr. Roy Kulcsar preyed on

17

Barone's weakened health and mental state, manipulating him with threats and fear.
Tactics which he also used with other clients, as documented in his disbarment
proceedings.

37.   Given all of the documentation, the hard evidence, sworn testimony from
Shannon, Barone, and the Disciplinary Committee, including a hand written Promissory
Note for $21k for a loan Mr. Roy Kulcsar "barrowed" from Barone, his hand written
"contract", the Lawyer's Fund for Client Protection and the courts should have no
question or doubt as to the veracity of Barone's claim, the questionability of Mr. Roy
Kulcsar's intent, and the fact that Barone was robbed by a corrupt attorney.

38.   Additionally, Barone is aware that his claim far exceeds the parameters for
eligibility under 22 NYC RR Part 7200.8 (1)-(6) according to New York Code, Rules and
Regulations.

> *"Our legal system of justice relies on attorney's, members of the bar, not to not
> simply follow the law, but uphold its finest principle's and ideal's; but when
> lawyer's use their law license's as weapon's as a guise to extort payments for
> themselves, they are no longer acting as attorney's; they are acting like criminal's!,
> and should be held responsible for their conduct."-  Geoffrey Berman, U.S. Att'y*

A comparison of Barone's Statement of Facts and the Affidavit of Shannon Ross,
Exhibit A, with the responses from the Defendants show that the Defendants rewrote the
facts of his case in order to arrive at their pre-determined judgement.

18

Plaintiff Barone was and still is suffering from PTSD.   See Affidavits of David S. Brendel, M.D., Exhibit B, and J. Vance Vandergriff, M.D. Exhibit C, attached hereto.

## Legal Claims
## First Cause of Action
## Judgement Obtained by Fraud

While there is a strong interest in the finality of judgments, such that assertions of fraud that are intrinsic to the claim that led to entry of a judgment may be entertained only by direct appeal or by motion to vacate made to the court that rendered the judgment, *see, e.g.,* N.Y. C.P.L.R. § 5015, D. Siegel, *Practice Commentaries*; *Crouse v. McVickar*, 207 N.Y. 213, 100 N.E. 697 (1912); *Vinokur v. Penny Lane Owners Corp.*, 269 A.D.2d 226, 703 N.Y.S.2d 35 (1st Dep't 2000), New York common law has long recognized that equitable relief may be granted to a person victimized by the procurement of a judgment through fraud that is extrinsic to the gravamen of the cause of action, *see, e.g., Ward v. Town of Southfield*, 102 N.Y. 287, 292-93, 6 N.E. 660, 661 (1886) ("*Ward*"); *Gray v. Richmond Bicycle Co.*, 167 N.Y. 348, 355, 60 N.E. 663, 665 (1901) ("*Gray*").

*Courts of equity have general jurisdiction to grant relief against fraud, and to set aside all deeds, contracts and other instruments obtained by fraudulent practices; and the jurisdiction of the court to grant such relief extends not only to voluntary contracts inter partes, but also to judgments and decrees of courts.*

*Ward,* 102 N.Y. at 292, 6 N.E. at 661 (emphases added); *see, e.g., McDonald v. McDonald*, 228 A.D. 341, 343, 239 N.Y.S. 533, 535 (1st Dep't 1930) ("A court will annul or restrain the enforcement of a judgment obtained by fraud either between the parties, or upon the court.").

***Chevron Corp. v. Donziger*, 14-0826 L, 14-0832 C (2d Cir. 08/08/2016)**

The fraud perpetrated against the Plaintiff appears to be an ongoing one:

19

Do judges routinely display a casual attitude toward the facts of the case? I suggest that practicing attorneys be asked whether they have had cases where the judge's statement of the facts were false. Every practicing attorney to whom I have asked this question has responded in the affirmative; some have told me that the practice is, unfortunately, quite common, and that judicial misrepresentation of the facts of cases has produced a crisis in their professional lives. They feel that their work is subject to the whim of judges who play God with the facts of a case, changing them to make the case come out the way the judge desires. Some say that if they had known that the practice of law would be like this, they would have gone into a different profession. Professor Monroe Freedman recently stated in a speech to the Federal Circuit Judicial Conference:

> Frankly, I have had more than enough of judicial opinions that bear no relationship whatsoever to the cases that have been filed and argued before the judges. I am talking about judicial opinions that falsify the facts of the cases that have been argued, judicial opinions that make disingenuous use or omission of material authorities, judicial opinions that cover up these things with no-publication and no-citation rules.

Professor Freedman wrote a letter to me in which he stated that at the luncheon immediately following his speech, a judge sitting next to him said (apropos of the passage above quoted), "You don't know the half of it!"

Apart from these professional concerns, we should also ask ourselves what kind of a judiciary system this society has produced where judges can misstate the facts of a case and then proceed to apply the law to those fictitious facts. Can any person be safe in court if this practice is allowed to continue? If judges can listen to the evidence and then tell a contrary story, what remains of justice? The vaunted security we have in a free country and a just legal system turns to quicksand. Our case may be factually proven, legally required, and morally compelled, but we can still lose if the judge changes the facts. And if we complain no matter how loudly higher courts will not be interested in reviewing a "factual" controversy, and the legal community, as well as the general public, will assume that the facts were those stated by the judge.

Anthony D'Amato, *The Ultimate Injustice: When a Court Misstates the*

*Facts*, Cardozo Law Review, vol. 11, 1313, 1345-1346 (1990) (footnotes omitted).

The Symposium of which this essay is a part is entitled "Deconstruction and the Possibility of Justice." If we take the most elementary interpretation of the last term, "justice"—at a level even more basic than that explored by Jacques Derrida when he patiently deconstructed the title of this Symposium—we must acknowledge that justice, in any situation, depends upon a full and fair accounting of the *facts* of that situation. If, instead of facts, *fictions* are introduced that are *contrary* to the facts, then any claimed "just solution" based on such fictions cannot achieve justice in the real world. The proposition is so elementary that it usually goes without saying.

Anthony D'Amato, *The Ultimate Injustice:  When a Court Misstates the Facts*, Cardozo Law Review, vol. 11, 1313 (1990) (footnotes omitted).

Practicing attorneys are, as a matter of course, *terrified* of exposing such judicial

frauds.

[T]here are few checks on what judges say about counsel other than the judge's own prudence.  A lawyer attempting to pursue a client's interest zealously may, if faced with an arbitrary judge or a judge who has an erroneous view of the facts, end up with a blot on his or her record that will never be erased-unless an appeal is possible to correct the problem.

*Williams v. United States*, 158 F.3d 50, 50 (1st Cir.1998) (Lynch, J., dissenting from denial of reh'g en banc).  Needless to say, "[a]rmed with life tenure and broad discretion, a [federal] judge can do great harm to a lawyer's career, while the attorney has virtually no recourse at all."  Steve Lubet, *Just Who Made Federal Judges God?*, Chic. Trib., Aug. 10, 2001, at 23.

*United States v. Gonzales*, 344 F.3d 1036, 1047 (10th Cir. 2003).

Plaintiff submits that practicing attorneys are equally terrified of what state judges

can do to their careers.   Which causes other problems:

A mere formal right of access to the courts does not pass constitutional muster. Courts have required that the access be "adequate, effective, and meaningful."

> *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 857-858 (5th Cir. 2000) (citation omitted).

## Second Cause of Action
## Denial of Due Process

Saferstein's federal complaint alleges, inter alia, that the Fund violated his Due Process rights by (1) delaying its decision for an excessive period; (2) not providing him a hearing before denying his claim, in violation of N.Y. Comp. Codes R. & Regs. tit. 22, § 7200.10(f); and (3) not apprising him of his appellate rights and the time limits to appeal when it issued its "final" decision denying his claim. The district court dismissed the action under Rooker-Feldman after concluding that Saferstein was, in effect, seeking to have a federal court review claims that had been adjudicated by a state court.

> *Saferstein v. Lawyers' Fund for Client Protection*,
> 142 Fed.Appx. 494 (2d Cir. 07/19/2005)

The ruling for Defendant Supreme Court of New York, Appellate Division, Third

Department denying his claim is attached hereto as Exhibit D.

THE COURT: Denied; that's right.

MR. KATZ: May I ask the reasons, your Honor?

THE COURT: Just because I said it, Counsel.

I could stop right here and have no trouble concluding that the judge committed misconduct. It is wrong and highly abusive for a judge to exercise his power without the normal procedures and trappings of the adversary system-a motion, an opportunity for the other side to respond, a statement of reasons for the decision, reliance on legal authority. These niceties of orderly procedure are not designed merely to ensure fairness to the litigants and a

correct application of the law, though they surely serve those purposes as well. More fundamentally, they lend legitimacy to the judicial process by ensuring that judicial action is-and is seen to be-based on law, not the judge's caprice.

*In re Complaint of Judicial Misconduct*, 425 F.3d 1179 (9th Cir. 2005)

Plaintiff submits that American Citizens are *fed up* with this type of judicial arrogance,

which is unfortunately no a new problem:

The aggrieved party read and reread the briefs as well as the transcripts. His mind is fed on nothing else during the three months waiting for the action of the court. He knows every point raised. He can repeat every argument advanced. All his savings through a lifetime are tied up in the case. He knows he is right. Then comes the decision. It deals with none of the points argued. It shows on its face the court refused to read the brief. He had been tossed aside like a white chip. He knows, and his friends know, he has been denied his day in court.

To that man, to his family and to his friends, organized society is organized iniquity.

And the present system is manufacturing citizens of such sentiments by the thousands every year.

Underneath the social unrest of the world today, as its main underlying cause, is the feeling in the breasts of the masses that justice is not for them. They do not know the cause, nor can they suggest the remedy,—and so they only want to destroy. Society to them has come to mean organized injustice.

John Rustgard,[1] *Dry Bones—The Remedy for the Evil*, 88 Central Law Journal, p. 341, 344 (May 9, 1919).

## Third Cause of Action
## Denial of Equal Protection of the Law

---

[1] Associate city attorney of Duluth, 1897-1898, mayor of Nome 1903-1904, U.S. district attorney 1st Division of Alaska, 1910-1914, and Attorney General of Alaska, 1921-1933.

The "pro se treatment" Plaintiff has been subjected to should be self-evident.

### Fourth Cause of Action
### Violations of the American With Disabilities Act

See Exhibits B and C.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. It also provides that "[a] State shall not be immune under the eleventh amendment [sic] to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." § 12202. In *Tennessee v. Lane*, 124 S.Ct. 1978 (2004), the Court held that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." Id. at 1994.

> Muhammad was next required to demonstrate that he was excluded from the benefits of some public entity"s services, programs, or activities. The District Court"s analysis with respect to this prong is flawed in several respects. First, the District Court stated that Muhammad "failed to allege facts establishing that litigation in the state courts constitutes a program or activity within the meaning of the ADA." D. Ct. Doc. No. 101, 14. It is not clear what "facts" the District Court expected Muhammad to allege in that regard, as courts have recognized a due process right to meaningfully participate in civil litigation, the violation of which is actionable under the ADA. See, e.g., Lane v. Tenn., 315 F.3d 680, 682 (6th Cir. 2003) ("Among

24

the rights protected by the Due Process Clause of the Fourteenth Amendment is the right of access to the courts. . . . Parties in civil litigation have [a] . . . due process right to be present in the courtroom and to meaningfully participate in the process unless their exclusion furthers important governmental interests."), aff'd, 541 U.S. 509 (2004).

The District Court also faulted Muhammad for failing to "articulate any theory that would impose liability on the Courts as institutional defendants." D. Ct. Doc. No. 101, 16. However, the ADA imposes liability on any "public entity," § 12131, which is defined as "any State or local government; [or] any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ." § 12131(1). Thus, the plain language of the ADA subjects state courts to liability for violations of the statute. Accord Galloway v. Super. Ct. D.C., 816 F. Supp. 12, 19 (D.D.C. 1993) ("The Superior Court and the District of Columbia are public entities within the meaning of the [Americans with Disabilities] Act.").

*Akhi Raheem Muhammad v. Court of Common Pleas of Allegheny County, Pennsylvania,* No. 11-3669 (3d Cir. 5t2012)

## Relief Requested

1.  Trial by jury on all issues triable by jury.

2.  Damages, if available.

3.  A declaratory judgement, pursuant to 28 U.S.C. §2201, that judges (nor anyone else) who deny litigants due process when they rewrite the facts of a case are guilty of fraud on the court.

25

4.  A declaratory judgement, pursuant to 28 U.S.C. §2201, that Defendants have violated the Americans With Disabilities Act with their actions described in this Complaint.

5.  A declaratory judgement, pursuant to 28 U.S.C. §2201, that judges who issue rulings with no statement of facts and/or conclusions of law violate the due process rights of litigants.

6.  A declaratory judgement, pursuant to 28 U.S.C. §2201, that Defendants have violated the rights of the Plaintiff under the Fourteenth Amendment, due process and equal protection of the laws.

7.  That Plaintiff be allowed discovery.   How many other pro se litigants have been given the "bum's rush" by these Defendants?

8.  Plaintiff's cost of this suit.

9.  Such other relief as this Court deems just, proper and equitable.

Respectfully submitted,

Date:  January 21, 2021

Joseph S. Barone

**Verification**

I swear, pursuant to 28 U.S.C. §1746, that I have read the foregoing Federal Civil

Complaint and that it is true & correct to the best of my knowledge and recollection.

Joseph S. Barone

# Witness Statement of Facts

# Sworn Affidavit

I, Shannon Ross, on this 5th day of October, 2018, and residing at 4715 Harvest Dr., Myrtle Beach, South Carolina, 29579, hereby swear that the following is factual and true.

In the spring of 2009 Mr. Kulczar contacted me requesting that I encourage Mr. Barone to make Mr. Kulczar - Mr. Barone's power of attorney (POA). Mr. Barone was in pre-trial custody on the Special Housing Unit (SHU) at the Metropolitan Detention Center (MDC), in Brooklyn, New York with virtually no contact outside of the prison. I had misgivings about Mr. Kulczar from the onset of his "representation" of Mr. Barone, and so I refused his request.

During my subsequent visit to Mr. Barone, he expressed that Mr. Kulczar had made him "nervous" by repeatedly pointing out how the FBI had betrayed Mr. Barone, and that they would likely seize Mr. Barone's assets to prevent him from affording additional legal fees, and in spite of the fact that the assets were all legally gotten gains. Mr. Kulczar bolstered his claims by using the example of another inmate, of whom Mr. Barone was aware, also on the SHU who had all of his assets seized.

Mr. Barone desperately needed someone he could trust, he was literally and figuratively alone in the world, he was under extreme stress, confused and frightened. Thankfully most cannot comprehend the utter devastation of having been betrayed by the only people with whom you've entrusted your life, but Mr. Kulczar knew all this. Mr. Kulczar preyed on this, telling Mr. Barone that they were "close like brothers", and that he "loved" Mr. Barone like family, wanting only to "protect" him. Mr. Kulczar was cunning, manipulative and annoyingly and frustratingly persistent, working relentlessly on Mr. Barone's fears, harassing him, and me, with a cacophony of factual and exaggerated examples of the FBI agents on a mission to harm Mr. Barone, pointing out how they had purposely and with calculation, leaked Mr. Barone's confidential informant status to the press, and ultimately rendered him "marked" and unable to defend himself.

After MONTHS of Mr. Kulczar's relentless pursuit, Mr. Kulczar offered an alternative, make ME Mr. Barone's POA, and place half of Mr. Barone's liquid assets into an escrow account.

Prior to agreeing to this, during our once-weekly visitation, Mr. Barone and I discussed the drawbacks and benefits to my being his POA. We established he was confident that I would not steal from him, and I could easily manage his day-to-day affairs, alleviating a small measure of his stress. I explained that I had yet to research the legality of an escrow account as an option.

Having no legal experience or legal contacts of my own, and a very limited income, I contacted Mr. Kulczar's paralegal, "Nancy", I had more trust in her because she, although very diplomatic, had cautioned me in the past regarding Mr. Kulczar on other matters related to Mr. Barone. I asked her if it was legal and ethical for Mr. Kulczar to receive and place Mr. Barone's money into an escrow account. She again advised me to be cautious of Mr. Kulczar where money was concerned, but stated there were accounts that served this purpose legally, such as IOLTA and some forms of escrow accounts. She stated that as long as Mr. Kulczar provided proof of the accounting, Mr. Barone's money should be "OK".

Through online "legal" advisory websites, I spent days researching these types of accounts based on the information Nancy had given me. I learned that there was *nothing illegal* about a person without direct access to their funds (imprisoned or otherwise) to place money in escrow or IOLTA accounts BECAUSE these types of accounts are completely traceable, and protect the invested party from being robbed by unscrupulous lawyers. I also read example cases where government seizures had left defendants defenseless. (I even paid out of pocket to "live chat" with an attorney on one of the many sites I had found and had the legality and expectations explained further and confirmed.)

Days later during visitation, I spoke with Mr. Barone in greater detail since I had a better understanding of the legality of placing a portion of the assets in an escrow or IOLTA account.

It was only AFTER confirming that it was *completely legal and common practice*, did I agree to *discuss* it further with Mr. Kulczar. Only AFTER Mr. Kulczar agreed that the money was Mr. Barone's, would remain Mr. Barone's, and would be returned to Mr. Barone at any time without prior notice or explanation, did I agree to *consider* the transfers. Lastly, only AFTER Mr. Kulczar agreed that I would receive proof of the creation, maintenance and statements from the new account, did I finally *agree* to the transfers.

I did everything I could think of and could afford, to ensure that it was completely legal; and safe, to ensure that Mr. Barone would have access to his funds if needed for his defense, or to take repossession of them at any time, and to ensure that Mr.

2

Kulczar was not going to steal the money from Mr. Barone. It was ME, not Mr. Barone, who made these decisions based on the otherwise reliable research and information that I had.

*Weeks* later Mr. Kulczar had me sign multiple POAs, one for each bank, and he notarized them. It took *months* for all the transactions to be completed because of my work and personal schedules. There was no secrecy or subterfuge ever committed, intended or even possible, because it was ME making the decisions for Mr. Barone in his incapacitated and helpless state.

Given that (legal counsel) Mr. Kulczar and I were the ONLY authorized visitors to Mr. Barone, the FBI was well aware of my movements and actions, even visiting my place of employment when they received bad information that my life may be in danger. Also, it took MONTHS to complete the transactions, ALL in plain sight of the FBI, because, as the FBI was well aware, Mr. Barone had his assets secured in multiple banks to remain within the FDIC insurance limits at the times he had opened the accounts years prior.

After the first transaction, Mr. Kulczar showed me a hard copy deposit slip with an account number on it, and continued this practice throughout the numerous, documented transfers, all the while repeatedly pushing for more money from Mr. Barone's multiple accounts.

Weeks after the last transfer was made, in late summer of 2009, Mr. Barone had a status hearing scheduled with the court. I was present for the first time. After the hearing ended, Mr. Kulczar mentioned to me that Mr. Barone was "recovering, but still in pain". I had no knowledge of what this meant, so I asked Mr. Kulczar to explain.

Mr. Kulczar told me, in the hall outside the courtroom, that Mr. Barone was suffering from a STAPH infection that had caused a large, extremely painful, walnut sized-calcified mass to form in his groin area. He went on to say that the Physician's Assistant at MDC had cut Mr. Barone open twice to remove the mass, without anesthesia; in an empty cell or storage room on the SHU. The sutures were still in the wound that day in court. I was stunned! I asked him why I was not made aware of this, but more so, why he had not brought this up in the status hearing?! He replied by feiging tears and saying, "I know, I know", as if to say he was upset it wasn't raised in the hearing. I was infuriated and confronted him stating that it was HIS responsibility to keep the court and I informed, because Mr. Barone was under extreme mental and emotional distress and even still, had no contact outside the prison but Mr. Kulczar and me. He had no answer.

3

My next visitation at MDC was just a few days after this confrontation, so I questioned Mr. Barone as to why he didn't notify the court when Mr. Kulczar failed to do so for him. Mr. Barone stated to me that he was afraid to say anything to me or the judge because of potential retribution when he returned to the SHU. Mr. Barone was physically and mentally weak and frightened. He had lost over 20lbs from his already lean frame since being moved to the SHU, he was gaunt and his skin was jaundice in appearance. Having been in the medical field for over 20 years, it was apparent to me that his physical health and wellbeing were clearly at risk.

As a result, I personally began writing and faxing the judge directly on Mr. Barone's behalf, BECAUSE Mr. Kulczar was NOT standing for or defending his client in that courtroom. He had made it apparent to me that he was in it only for his personal gain. I was disgusted and compelled.

I began to set in motion a series of definitive actions.

- I demanded the return of Mr. Barone's money in total from Mr. Kulczar; it was MY responsibility.

- I began to seek replacement counsel for Mr. Barone, and

- I continued to write directly to the court, giving Mr. Barone a voice and a fighting chance, and exposing and Mr. Kulczar for what he truly was.

It is solely because of the content of the letters I submitted to the court, that the judge ordered medical hearings with the medical and legal staff from MDC. (To further emphasize the sum total of our experiences with the lawyers involved in the case to that point in time, the legal representative from MDC, Kristin Colvin, verbally mocked and taunted me in the courtroom before the commencement of the medical hearings. With no response/reaction from me, AUSA Polite had to tell her to "knock it off".)

Mr. Kulczar reluctantly began to return the money in relatively small amounts. It took me several months and 36 interviews to secure an honest attorney, and in spite of the Judge's order to get Mr. Barone proper medical care, Mr. Barone suffered 2 more perfunctory procedures within MDC to remove additional calcified masses caused by the severe STAPH infection. It was only when he suffered irregular heartbeats that he was effactually taken to a real hospital, but even still, received the bare minimum of "care", and within hours he was returned to MDC.

4

From the onset, Mr. Barone was alone, scared, confused, weak, sick, and in solitary confinement, a helpless witness to Mr. Kulczar stealing nearly half of his life savings. I later learned that the documents Mr. Kulczar had shown me were fraudulent; they were not from an existing escrow account as he had claimed. There never was an escrow account, all the money went into Mr. Kulczar's personal business account. The checks he did issue to me in partial repayment were drawn from his personal business account as proven by the account number on the checks in evidence. I was not able to recover all of the money before Mr. Barone was acquitted under representation of replacement council. Nor was I able to recover the rest of the money from Mr. Kulczar before he was disbarred.

When Mr. Barone was acquitted I filed complaints against Mr. Kulczar on behalf of Mr. Barone, because he now suffers from devastating and debilitating PTSD; the first with the Disciplinary Committee and the second, criminally in Albany, NY. I provided substantial, substantive, chronological and detailed evidence of Mr. Kulczar's illegal, unethical and immoral actions, all of which the Lawyer's Fund for Client Protection has had from day one in their possession. Mr. Kulczar was ultimately disbarred, in part, due to his schemes against Mr. Barone, but also for bilking other trusting clients out of thousands of dollars, also in legal fees for ineffectual and unlawful counsel, but additionally for coercion and kickbacks.

Under penalty of law I hereby state that these accounts are true and factual to the best of my knowledge and recollection. Additionally, I do not expect or anticipate any personal benefit from these statements or from the lawful and just recovery of Mr. Barone's money. He and I were legally divorced 6, June 2016.

This statement was signed before me on _10/5/18_.

By _____

Shannon Ross

KAVITA DINANAUTH
Notary Public
State of South Carolina
My Commission Expires Oct 3, 2026

Notary Signature

5